# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | No. CR05-1015 |
| vs. | **REPORT AND RECOMMENDATION** |
| MICHAEL J. VANDENBERG, | |
| Defendant. | |

This matter comes before the court pursuant to the defendant's May 19, 2005 motion to suppress statements (docket number 15). This motion was referred to the undersigned United States Magistrate Judge for issuance of a report and recommendation. The court held an evidentiary hearing on this motion on June 2, 2005, at which defendant Michael Vandenberg was present and represented by Mark Brown. The government was represented by Assistant United States Attorney Ian Thornhill. It is recommended that the motion to suppress be denied.

The motion to suppress statements arises out of two interviews of the defendant taking place in July, 2003, and in March, 2005, at the defendant's residence. The defendant contends that the verbal and written statements he made in the course of the March, 2005 interview should be suppressed because (1) he was in custody and being interrogated during the interview and did not receive his Miranda rights prior to or at any time during the interrogation and did not execute a waiver of his Miranda rights[1]; and

---

[1] In support of the proposition that the defendant was in custody because he was
(continued…)

1

(2) his March 7, 2005 written statement was not free and voluntary as "[b]ased upon the [d]efendant's severe problems with memory deficits, concentration, and comprehension combined [with] the [a]gents' several hour me[n]tal bruising, the [d]efendant caved into the pressure and authored a statement." The defendant argues that his statements and any information flowing from those statements must be suppressed because "the [a]gents well knew of the [d]efendant's delicate mental conditions, [y]et said [a]gents undertook various nefarious procedures that horsewhipped the confines of the defendant's mind!" The court makes the following findings of fact and conclusions of law.

## **FINDINGS OF FACT**

Sometime after May 23, 2003, FBI agent Travis Yarbrough received a call from an FBI agent in Mesa, Arizona, who stated that the Mesa, Arizona Police Department had received a threat via email that had been traced back to the defendant in Dubuque, Iowa. In July, 2003, Agent Yarbrough went to the defendant's residence, which he shared with his parents, to execute a search warrant and seize items in connection with the email threat. Members of the Dubuque police force accompanied Agent Yarbrough. During the course of executing the search warrant, Agent Yarbrough interviewed the defendant. The defendant indicated to Agent Yarbrough that he had suffered a stroke approximately five years prior, and had some resultant memory issues. The defendant initially denied that he had any knowledge of the email threat, but when Agent Yarbrough told the defendant that law enforcement was seizing his computer and planned to analyze it for any threats, the defendant told Agent Yarbrough the he had lied and that "it wasn't intentional." The defendant told Agent Yarbrough that he knew the address for the Mesa Police Department

---

$^1$(…continued)
segregated from his family in his home, the defendant cites to the cases of United States v. Griffin, 922 F.2d 1343 (8th Cir. 1990) and United States v. Longbehn, 850 F.2d 450 (8th Cir. 1988).

and that he had sent emails in the name of Jeff Lindsey. The defendant explained to Agent Yarbrough that he had received a large amount of unwanted SPAM emails and had found that the owner of the web-site which was responsible for sending those SPAM emails to him was a person named Jeff Lindsey. The defendant stated that he sent emails in Jeff Lindsey's name in an attempt to get Mr. Lindsey in trouble. The defendant did not specifically admit to having made the email threat to the Mesa Police Department.

Out of curiosity, Agent Yarbrough asked the defendant if law enforcement could expect to find child pornography on the defendant's computer. The defendant answered that there would likely be pornography found on the computer, but that it should all be adult pornography. The defendant was not taken into custody or arrested at the conclusion of this interview. After learning from the defendant, during the July, 2003 interview, that the defendant had suffered from a stroke, Agent Yarbrough never investigated the defendant's medical background further to learn more about the physical or mental effects of the stroke.

During the time between the initial interview of the defendant and March, 2005, Agent Yarbrough received information concerning the presence of child pornography on the defendant's computer. Specifically, while authorities in Mesa, Arizona were analyzing the defendant's computer for evidence of the email threat, they discovered child pornography. Based on this new information, Agent Yarbrough interviewed the defendant for a second time at his residence. Agent Jason Amoriell accompanied Agent Yarbrough to the interview. Upon arriving at the defendant's residence, which was still a shared residence with the defendant's parents, the defendant's parents answered the door, allowed the agents to enter, and called for the defendant to come speak with the agents. Because the agents planned to question the defendant about child pornography and further planned to show the defendant several of the child pornography images that had been taken from his computer, the agents thought that it would be better for the defendant to be questioned in private so that his parents would not hear the questions about child pornography or view

the child pornography images. Agent Yarbrough thought that it would be awkward for the defendant to have the issue of child pornography discussed in front of his parents. The interview began at approximately 2:15 p.m. and took place at a small table with a few chairs in the basement of the defendant's residence. The basement had only one known entrance and exit.

The agents told the defendant that he was not obligated to answer their questions. The defendant again stated that he had suffered from a stroke and had some memory problems. Agent Yarbrough asked the defendant about the child pornography that had been found on his computer. The defendant admitted to visiting certain news group websites and looking at minor girls on the internet. The defendant appeared computer literate to Agent Amoriell because when asked if his hard drive was partitioned, the defendant knew what Agent Amoriell meant and was able to answer the question. The agents asked the defendant if he would walk them through the process of downloading images via KAZAA and news groups on the computer that the defendant currently had in use. The defendant declined to do so, stating that he had too much on his mind. The agents did not press the issue further.

Agent Yarbrough showed the defendant the pictures that had been retrieved from his computer, and asked him to initial and date the backside of any pictures that he specifically remembered. Out of approximately 20 pictures that were shown to the defendant, he initialed and dated the backside of 4 pictures. The defendant stated that he had "probably seen" some of the other pictures, and stated that he had no specific recollection as to the remainder of the pictures.

Sometime shortly before 4:00 p.m., Agent Yarbrough asked the defendant if he wanted to provide a written statement summarizing what had been discussed during the interview. Neither Agent Yarbrough nor Agent Amoriell told the defendant that if he wrote a statement or made some admissions he could avoid criminal charges. The defendant agreed to provide a written statement and began writing the statement at

4

approximately 4:00 p.m.. The agents suggested to the defendant the topics to be covered in the written statement, but did not provide guidance as to specifics. The defendant asked the agents if he could write in the statement that it was his idea to write the statement. The agents told the defendant that they could not direct him as to what he should specifically write. After he finished writing the statement, the defendant read the statement to himself while the agents remained silent at the defendant's request, and the defendant then signed and dated the statement at approximately 4:30 p.m.. Agent Yarbrough and Agent Amoriell also signed and dated the statement. The written statement read, in relevant part, as follows:

> I Mike Vandenberg am writing this freely and voluntarily. I also suggested doing this to see if I can put this behind me. . . . I regret to no end this threat. . . . If I remember right the only thing I had in mind was to get a spammer off my back that would not leave me alone. . . . The photos of the minor girls came from the internet. . . . They would have come from news groups or KAZAA. I don't specifically recall downloading the photos or when that would have happened . . . [t]hey would have been downloaded to the Gateway computer. I sign this statement as true and correct after reading it.

The interview ended at approximately 4:45 p.m.. At no time during the interview was the defendant's movement restricted. It did not appear to the agents that the defendant was in any sort of medical distress at any time during the interview. The defendant never asked the agents if he could leave or excuse himself for any reason. The defendant's family members never asked to join the interview. At the conclusion of the interview, the defendant was not placed in custody and was not arrested.

In support of his motion to suppress, the defendant submitted a report dated May 2, 2005, completed by psychologist Keith Gibson, which states:

> Test results suggest that [the defendant] is capable of remembering and understanding instructions, procedures, and locations in a work setting, but memory deficits impair concentration and comprehension over time. Mental stamina

5

is significantly impaired. This individual is unable to maintain attention, concentration, and pace sufficient for full-time gainful employment. His capacity to interact appropriately with others appears to be well retained. Judgment is intact. He appears capable of making responsible life decisions for himself. Memory deficits significantly impair his capacity to remain adaptive and flexible in response to changes in a work environment. If disability benefits were to be reinstated, this individual is capable of managing his own cash benefits.

## **CONCLUSIONS OF LAW**

### Miranda Warnings

The defendant first contends that the statements and written statement/confession made by the defendant during the March 7, 2005 interview should be suppressed because he was in custody and did not receive Miranda warnings. The government argues that the defendant was not in custody for purposes of Miranda when he was interviewed in the basement, and accordingly, the statements made by the defendant should not be suppressed. The parties agree that no Miranda warnings were given to the defendant during either interview.

The court finds that the defendant was not in custody during either the July, 2003 or the March 7, 2005 interviews and that consequently, Miranda warnings were unnecessary. The holding of Miranda dictates that a person who is "taken into custody or otherwise deprived of his freedom of action in any significant way" must be warned that he has the right to remain silent, that any statement he makes may be used as evidence against him, and that he has the right to the presence of an attorney, either retained or appointed, before law enforcement may begin questioning. United States v. Martin, 369 F.3d 1046, 1056 (8th Cir. 2004) (citing Miranda v. Arizona, 384 U.S. 436, 444 (1966)).

In determining whether the defendant was "in custody" for purposes of Miranda, the court makes a two-part inquiry. First, the court examines the circumstances surrounding the interrogation. Second, the court determines, given those circumstances,

whether a reasonable person would have felt that he or she was not at liberty to terminate the interrogation and leave. Martin, 369 F.3d at 1056 (citing United States v. LeBrun, 363 F.3d 715, 720 (8th Cir. 2004); quoting Thompson v. Keohane, 516 U.S. 99 (1995)). "The initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." Id. at 1056-57 (citing Stansbury v. California, 511 U.S. 318, 323 (1994)). The Eighth Circuit Court of Appeals has commonly used six non-exhaustive indicia of custody in assessing whether an interrogation is custodial. Id. at 1057. The six indicia are as follows:

> (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; (6) whether the suspect was placed under arrest at the termination of questioning.

Id. (citing United States v. Griffin, 922 F.2d 1343, 1349 (8th Cir. 1990).

Here, these indicia support a finding that the defendant was not in custody. First, the defendant was informed by the agents that he did not have to answer their questions. Second, the only evidence presented indicates that the defendant enjoyed unrestrained movement throughout the entire course of the interview. He was not told that he could not leave the room, leave the home, or ask the agents to leave, and he was not chaperoned by the agents before, after, or during the course of the interview. Third, the evidence demonstrates that the defendant voluntarily acquiesced to the agent's requests to respond to questions, even going so far as to voluntarily author a written statement. Fourth, there has been no evidence presented that would indicate that strong arm tactics or deception

7

were used during the course of the interview. Fifth, the questioning atmosphere was not police dominated. The defendant's parents were never asked to stay away from the basement or the interview. The fact that there was only one exit and entrance to the basement does not establish that the atmosphere in which the defendant was questioned was police dominated. Finally, the defendant was not placed under arrest at the conclusion of the interview. Considering the totality of the circumstances surrounding the interview, the court finds that a reasonable person would not have believed himself to be in custody. Accordingly, the court finds that the defendant was not in custody during the interview and Miranda warnings were therefore not required.

## Voluntariness

The defendant next challenges the voluntariness of his statements and in particular his written statement given during the March 7, 2005 interview. The defendant argues that based upon the report of psychologist Keith Gibson, it is "clear that the [d]efendant could not have authored any free statements to law enforcement on March 7, 2005 via the defendant's disclosed mental condition." The government argues that the defendant's confession was free and voluntary because the defendant was not subjected to coercive conduct and because the defendant's memory loss "did not affect his capacity for self-determination."

In evaluating the voluntariness of a confession, the court is to examine the totality of the circumstances to determine whether "pressures exerted by the authorities overwhelmed the defendant's will." Martin, 369 F.3d at 1055 (citing United States v. Rodriguez-Hernandez, 353 F.3d 632, 636 (8th Cir. 2003). "Obviously, interrogation of a suspect will involve some pressure because its purpose is to elicit a confession." Id. (citing United States v. Astello, 241 F.3d 965, 967 (8th Cir. 2001)). Factors such as a "raised voice, deception, or a sympathetic attitude on the part of the interrogator will not render a confession involuntary unless the overall impact of the interrogation caused the

defendant's will to be overborne." Id. (citing Astello, 241 F.3d at 967) (quoting Jenner v. Smith, 982 F.2d 329, 334 (8th Cir. 1993)). "Rather, the coercive conduct must be 'such that the defendant's will was overborne and his capacity for self-determination critically impaired." Id. (citing United States v. Santos-Garcia, 313 F.3d 1073, 1079 (8th Cir. 2002) (quoting Astello, 241 F.3d at 967)).

Considering the totality of the circumstances, the court finds that the defendant's statements and written statement/confession were voluntary. There is no evidence whatsoever of coercion on the part of the agents during the course of the defendant's interview. The fact that the defendant has memory difficulties in connection with a stroke does not, in and of itself, render his statements or confession involuntary. There has been no evidence presented that the defendant was so mentally impaired that he did not understand that he was being interviewed by law enforcement, the questions that he was being asked, or the responses that he was giving. Although the interview, at the suggestion of the agents, was held in the basement of the defendant's residence away from the defendant's family, there is no evidence that the agents in anyway excluded the defendant's family or hampered the family's ability to join the interview at any time or for the defendant to rejoin his family and terminate the interview. The agents told the defendant that he was not obligated to answer their questions. The defendant himself demonstrated that his will was not overborne when he refused the agents' request to walk them through the steps of downloading as he had described on his computer. Further, the defendant's own written statement clearly indicates that he was motivated at least in part to give the statement in a desire to "put this behind" him.

For the reasons discussed above, **IT IS RECOMMENDED**, that unless any party files objections[2] to the Report and Recommendation within ten (10) days of the date of the

---

[2]Any party who objects to this report and recommendation must serve and file specific, written objections within ten (10) court days from this date. A party objecting
(continued…)

9

report and recommendation, the defendant's May 19, 2005, motion to suppress statements (docket number 15) be denied.

June 6, 2005.

_____
JOHN A. JARVEY
Magistrate Judge
UNITED STATES DISTRICT COURT

---

(…continued)
to the report and recommendation must arrange promptly for a transcription of all portions of the record the district court judge will need to rule on the objections.